[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS:
This is the case of Raymond W. III, whose date of birth is October 13, 1983, and who is the subject of coterminous petitions filed by the Commissioner of the Department of Children and Youth Services ("DCYS") alleging Raymond to be a neglected child and seeking to terminate the parental rights of his mother, Marsha B. and his father, Raymond W. Jr.
The petitions were filed on June 6, 1989 and were amended, with the permission of the court, on June 29, 1990 in order to upgrade the facts alleged and to add the ground of no ongoing parent-child relationship as to both parents.
On September 17, 1990, the day of trial, the petitioner orally moved to delete the ground of failure to rehabilitate indicating that it was inapplicable to a coterminous petition and that it had been alleged in error.
The grounds alleged by the petitioner in the amended termination petition are: (1) abandonment by the father, (2) no ongoing parent-child relationship by both parents, (3) acts of commission or omission by both parents. CT Page 3305
FACTS as of June 29. 1990.
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children, of which the court has taken judicial notice, permits the finding of the following facts:[1]
Raymond is a child who has been voluntarily placed in foster care on three occasions during his seven years of life. He was first placed by his mother in August, 1984 because she felt that she could not care for him. He remained in foster care on that occasion for three months.
On November 6, 1986, Raymond was adjudicated to be a neglected child as the result of falling out of the second story window of his home. Mother indicated that she told Raymond not to open a window screen but he did so anyway and fell from the window to the ground suffering a fracture to his skull. The child was found by the Court (Brennan, J.) to be living under conditions injurious to his well being and was placed under the protective custody of DCYS for a period of six months. That commitment was terminated of May 7, 1987.
In January, 1988 Raymond was again voluntarily placed in foster care after his mother contacted DCYS and once again expressed concerns about her ability to care for the child. Mother communicated to the DCYS worker that she was having difficulty in controlling Raymond, that there was hatred between them, and that she was afraid that she might not be able to stop hitting the child. Mother admitted to the social worker that she had slapped the child in the face for giving her a dirty look. (Petitioner's exhibit #4). As a result of these concerns Raymond was voluntarily placed in foster care by mother for the second time on January 17, 1988. He remained in foster care this time for two months.
On December 23, 1988 DCYS received a school referral that Raymond had head lice and that his fingers had been burned as the result of contact with a heater in the home. Mother testified that she told Raymond not to touch the heater but he did so anyway, resulting in the burns.
On March 16, 1989 Raymond reported to school officials and subsequently to DCYS social worker Gregory that he had not eaten and that his mother had hit him. He was observed to have red marks on his face and his nose was swollen. The next day mother was interviewed by a DCYS worker but would neither confirm nor deny having hit the child.
As a result of this incident, Raymond was voluntarily placed in foster care by mother for the third time on March 7, 1989. He has remained in foster care since that date.
On October 16, 1989 Raymond was admitted into the Newington Children's Hospital C.H.I.P.S. program because of aggressive behavior both in the foster home and in school. An important part of this program is a CT Page 3306 five week parent workshop, in addition to individual and family counseling and therapy. Both parents were notified of the child's admission to the C.H.I.P.S. program and invited to participate. Mother accompanied Raymond to the hospital for his admission and was told that the goal of the program was to work toward reunification of the family. She was advised that her participation was needed for the goal to be reached. (Testimony of Kerry Pugh).
Mother only attended two of the weekly sessions after the initial session on the day of admission. In addition, mother only visited with Raymond a total of seven times, including the three therapy sessions, during the almost four months of his hospitalization in Newington. All of these visits took place during the first six weeks. She did not visit at all between Thanksgiving, 1989 and February 9, 1990, the day Raymond was released from the hospital. Father never participated in the program nor did he visit with Raymond.
On December 15, 1990, Raymond's therapist in the C.H.I.P.S. program went to mother's home to encourage her to visit with her son and to participate in the therapy program. Mother was offered the services of a medical taxi in order to facilitate visitation and participation in the program. She refused claiming that she had to wait too long for the taxi and that she was pregnant and couldn't travel. Arrangements were made for her to make four collect telephone calls to Raymond each week but mother thereafter called only twice per week. She was also encouraged to write letters to her son but the only wrote to him on one occasion during the almost four months of his hospital stay. (Testimony of Kerry Pugh).
The Newington staff determined that Raymond needs a great deal of structure. He feels a sense of hopelessness, that nothing is going to change, and that no one will care for him. His behavior was very impulsive, aggressive, and at times out of control when he first arrived at the hospital. After some initial success in controlling his behavior, Raymond reverted to aggressive and impulsive behavior after mother failed to participate in treatment. He expressed anger toward his mother, he refused to write to her and said that she was dead. The written report of the hospital staff paints a bleak picture of a child with serious emotional difficulties and very special needs. (Petitioner's exhibit #1).
When Raymond was scheduled to be discharged from the Newington Hospital program in late January, 1990 mother wanted to take the child home with her. The hospital medical staff felt that due to his specialized needs Raymond required specialized foster care or residential treatment and that he would be in danger if returned to his mother. On January 18, 1990 an ex parte order was issued by the Court (Potter, J.) giving temporary custody of the child to DCYS. That order was sustained and continued on January 25, 1990 after mother failed to appear at the ten day hearing. CT Page 3307
Upon his release from the Newington Hospital program on February 9, 1990, Raymond was placed in a specialized foster home where he continues to reside.
Raymond was referred to the Wheeler Clinic Foster Parent Program upon his release from the Newington Hospital program, although he actually began his sessions at the Wheeler Clinic before his discharge from Newington. His primary therapist at the clinic is Dr. Richard McMillon, a Ph.D. clinical psychologist whose testimony the Court finds credible.
Dr. McMillon found Raymond to be a special needs child who requires a highly structured, consistent home and educational environment, and who will require ongoing therapy for an extended period of time.
Raymond is a child with intense emotions of love and hate. He is very angry with his mother for not taking care of him. His behavior can be explosive and he needs medication to help modulate his behavior and organize his thinking. Dr. McMillon found Raymond to be a child who needs a great deal of attention, much more than any normal seven year old: more like an infant.
This child has been diagnosed as having no borderline personality disorder. He deals with his feelings by becoming powerful fictional characters, such as superman or a robot, and while that certainly is not unusual in a child, what is unusual is that Raymond actually believes that he is the character. He is not pretending or playing, and it is difficult to get him out of the character. This, according to Dr. McMillon, is a frequent occurrence.
Both Dr. McMillon and the child's foster mother testified that Raymond's behavior significantly deteriorated in April and May, 1990 following a series of telephone calls from his mother. His behavior was so bad following a May 29, 1990 telephone call from mother that it was felt that he might need to be hospitalized. Consequently, mother's telephone calls were suspended, at the request of the Clinic, and Raymond showed gradual improvement thereafter.
Raymond saw his father for the first time in many years during a court ordered evaluation. Dr. McMillon reported that the child had no idea who his father was before that meeting. He was completely confused as to his fathers identity.
Dr. McMillon expressed the opinion that Raymond's trend has been positive since he has been in a structured home. It would be detrimental to the child to remove him at this time and that it is in his best interest to remain in his current structured foster home where he is receiving excellent care. He stated that if all goes well Raymond could be adoptable in approximately 18 months.
A court ordered psychological evaluation of mother, father, and child CT Page 3308 was conducted by Dr. Robert Meier, a licensed clinical psychologist, on April 24 and May 2, 1990. The Court finds Dr. Meier's testimony and report to be credible and attaches great weight to his observations and opinions.
Father indicated during Dr. Meier's evaluation that he has not visited with Raymond since custody of of the child was given to mother in July, 1985. Dr. Meier observed that what little interaction existed between father and child during the evaluation was initiated by the child. "There was little warmth or affection in the interaction. The interaction seemed to cause great deal of stress for the child." Dr. Meier concluded: "There is no clear relationship currently between father and child, and father seems to have limited understanding and knowledge of the child's needs and status." At the time of the evaluation mother had not seen Raymond for approximately six months but when he came into the room and sat next to her she said nothing to him and showed no reaction. The Court finds the following observations and opinions of Dr. Meier to be especially significant. (Petitioners exhibit #2)
 There was little affection between mother and child. Raymond clearly sought his mother's attention, but this was not reciprocated. The child was clearly upset and his response was to withdraw emotionally, but attempted to continue interaction in an anxious, emotionless manner.
 The relationship between mother and child raises concerns about the effect on the child. While Raymond wants a relationship with mother, meeting with her leads to anxiety and discomfort. Mother shows little warmth or understanding, and despite not having seen him for several months, debated with the child whether he was at fault when he fell from the window. She shows little understanding of his needs, and demonstrated little nurturance, comprehension or support of his needs.
 While mother is viewed as having been a caretaker in the past, and possibly the psychological parent of Raymond, the child shows little trust in this relationship and becomes very anxious and distressed when confronted by mother.
Dr. Meier found the prognosis for rehabilitation and reunification poor for both the parents and the child. He voiced the opinion that there is no on going parent-child relationship between either parent and the child and that it would be very difficult for Raymond to establish a relationship with either parent. He concluded that it would take a minimum of two years before reunification might be possible and that given the time Raymond has been in foster care that was too long to have the child wait for permanency in his life. (Emphasis added).
DCYS social worker Sandra Rudin testified that subsequent to Raymond's discharge from the Newington Hospital DCYS attempted to make arrangements for mother to have supervised visits with Raymond at the Willimantic DCYS office. Mother disagreed with the plan for supervised visits and wanted to have the visits in her home in Danielson. As a result CT Page 3309 she did not visit with Raymond at all.
Mother complained that she did not have transportation to visit Raymond either in Newington or in Willimantic. She indicated that she could not afford to take the bus between Danielson and Willimantic although when questioned by the court she stated that she did not know how much it cost and did not know the bus schedule because she had never inquired about either. She also stated that she could not take the bus because it did not have seat belts for her three year old child. She did not want to use the medical taxi service because she had to wait too long for the taxi.
During her testimony mother stated that "Raymond is just a typical hyper six year old child." She denied that Raymond had been placed in foster care in January, 1988. She also denied ever hitting the child in the face, and denied that Raymond had marks on his face and swelling of his nose on March 16, 1989. The Court does not find mother's testimony to be credible or persuasive.
What little contact father has had with his son over the past five years has been during the past few months. He did not see Raymond at all from July 1985 until the court ordered evaluation in April of 1990. He testified that he had been told that there was a permanent restraining order in effect to prohibit him from seeing Raymond; however, he admitted that he had never been served with a retraining order and never inquired about it. He claimed to have been sending gifts to his son, through DCYS, every Christmas and on Raymond's birthdays. DCYS, however, reported that they received only two such gifts for Raymond.
The child's foster mother testified that she works very closely with Raymond and that he needs a considerable amount of time and care. He can be very difficult. She participates with him at the Wheeler Clinic and has seen improvement in Raymond's behavior, although that behavior is "up and down". He is quite violent and out of control at times and he is not allowed to play with other children in the neighborhood because of the fear that he will physically hurt them. The foster parents love and deeply care for Raymond and are willing to keep him for as long as necessary.
Numerous services have been offered to mother throughout the years in an effort to help her with Raymond. Included among these services were, Parenting Aid, the John Dempsey Hospital Early Intervention Program, United Social Mental Health Services, Families-In-Training Program, The Newington Hospital C.H.I.P.S. program, the Young Parent's Program, plus transportation and visitation. Mother took advantage of some of these opportunities but generally failed to follow through with recommendations which could have led to reunification with her son. (Testimony of Sandra Rudin and Petitioner's exhibit #3, #4, #5).
PROCEDURE TO BE FOLLOWED CT Page 3310
Where neglect and termination petitions are coterminously filed under section 17-43a(e), the court is required to proceed in three separate stages.
First — Adjudication of the neglect petition.
The court must determine, by a fair preponderance of evidence, if the child has been neglected or uncared for as of the date the petition was filed or was last amended. In this case the petition was last amended on June 29, 1990. Neglect includes abused as that term is defined under the statutory definitions found in Section 46b-120 and Section 17-38a(b). If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since both are based upon the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication, termination petition.
The court must next determine whether the evidence provides clear and convincing proof that any pleaded ground exists to terminate the parent's rights. If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If grounds to terminate are found, it must move to the final stage.
Third — Disposition, both petitions.
If grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court must then consider whether the facts as of the date of disposition — the last date of hearing — support by clear and convincing proof, after consideration of the six factors enumerated in Section 45-61f(h), that such termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating the parent's rights, it must return to and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order may issue terminating the parent's rights.
ADJUDICATION — Neglect petition:
The evidence is clear that this child has been abused, that he has been permitted to live under conditions injurious to his well-being, and that he has been denied proper emotional care and attention.
There have been two clear instances of physical abuse since the last adjudication of November 6, 1986. The first was in January, 1988 when mother admitted to having slapped the child in the face, and the second was in March 1989 when the child reported that mother had hit him and red marks and swelling of the nose were observed. The Court finds that both incidents have been proven by a fair preponderance of the evidence. CT Page 3311
In addition, the Court finds that mother has not provided the child with a safe environment and has not been attentive to his physical welfare or well-being. Mother appears to have learned nothing about protecting her child from harmful situations as a result of the incident when he fell from the second story window. On that occasion she claimed to have told the child not to open the screen but he did so anyway. According to mother the accident was Raymond's fault because he did not listen to her.
In December, 1988, when Raymond burned his fingers on a radiator or a stove mother again denied any responsibility claiming that she told him not to touch the heater but he did so anyway. Again, it was the fault of the child with no responsibility being assumed by mother. The fact that this child has been physically abused and has not been protected from harmful situations by his caregiver constitutes being permitted to live under conditions injurious to his well-being.
In addition, mothers failure to participate in the family counseling portion of the C.H.I.P.S. program, to say nothing of her failure to visit the child while he was in the hospital, resulted in serious emotional trauma to this child constituting a deprivation of proper emotional care and attention.
The Court finds that the petitioner has proven Raymond to be a neglected child by a fair preponderance of the evidence.
ADJUDICATION — Termination petition:
ABANDONMENT:
Section 17-43a(b)(1) of the Connecticut General Statutes defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36 (1987).
Father did not visit with his son from 1985 until 1990 and his contacts with DCYS to inquire about Raymond during that time were negligible. While there has been some contact and visits during recent months, it is too little and too late. "General Statutes (Sect.) 17-43a(b)(1) does not contemplate a sporadic showing of `interest, concern or responsibility for the welfare of a child.' A parent must maintain a reasonable degree of interest in the welfare of his or her child." In re Rayna M., Supra at 33-38. "Maintain implies a continuing, reasonable degree of concern." In re Migdalia M., 6 Conn. App. 194, 210 (1986).
Father has had no meaningful interaction with Raymond over the past CT Page 3312 five years nor has he shown any interest in the child's welfare or well-being during that time. His claim that he believed there was a permanent restraining order prohibiting such contact is unpersuasive. A parent who cares for and loves his child would have made some effort over the years to be involved in the child's life. In this case father ignored the situation. The Court finds that the petitioner has proven by clear and convincing evidence that father has abandoned Raymond, as that term is defined by statute, and that this situation has existed for more than one year.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
 . . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
FATHER:
The Court finds from the evidence clear and convincing proof that there is no parent-child relationship in existence between father and Raymond, and that this situation has existed for more than one year.
Mr. Meier found little warmth or affection between father and child and no evidence of a parent-child relationship during his evaluation. Dr. McMillon indicated that Raymond had no idea as to the identity of his father prior to their meeting for the evaluation by Dr. Meier.
Father has not visited nor been any part of this child's life for the past five years. He has had no part in providing for the child's physical, educational, emotional or moral needs or development since Raymond was one and one half years of age.
It is unreasonable and unrealistic to expect that this father, who has not had anything to do with Raymond for most of his life, who has little understanding of the special needs of this child, and who was unable to effectively interact with Raymond during the parent-child evaluation, will be capable in the foreseeable future to core for and meet the needs of this child. It is clearly and convincingly not in the best interest of this child, who needs a permanent and consistent caregiver and environment, to wait for months or years, if ever, to determine whether a father, who has abandoned him, is willing or able to establish a parenting relationship with him.
MOTHER: CT Page 3313
The Court finds by clear and convincing evidence that there exists no ongoing parent-child relationship between Raymond and his mother, and while this situation may not have existed for one year, the totality of the circumstances require a waiver of that time requirement.
Mother has had minimal involvement with Raymond since before Thanksgiving of 1989, when she last visited with her son. She has no understanding of the child's problems or special needs. Rather, she sees him as a "typical hyper six year old".
Although telephone calls were discontinued between mother and child because of the negative effect they were having upon Raymond, mother never took advantage of the opportunities offered to visit with Raymond at the Newington Hospital or at the Willimantic DCYS office. The Court finds her excuses and explanations concerning transportation unavailing and unacceptable in this regard.
Mother's interaction with Raymond during the parent-child evaluation by Dr. Meier, after not seeing him for nearly six months, was nothing short of pathetic. She exhibited no warmth, no emotion and indeed no positive responses at all to the child reaching out to her. The effect of the meeting upon Raymond was emotional withdrawal and anxiety. Dr. Meier testified that he found no parent-child relationship between mother and Raymond.
While Raymond would like to have a positive and loving relationship with his mother, his demonstrative expressions of negative feelings about her, such as his aggressive and impulsive behavior at the Newington hospital when mother did not participate in his treatment, his remark that his mother is dead, as well as his behavior in the foster home following telephone calls from mother, are feelings of anger and hurt.
As indicated by Dr. Meier, the child may have viewed mother as his psychological parent and caregiver in the past, but he shows little trust in the relationship and becomes very anxious and distressed when confronted by mother. That most clearly is not the kind of relationship which should and normally does develop between a parent and child. It is certainly not a positive or healthy relationship, and it cannot be said that Raymond has positive feelings for his mother when her presence invokes such negative reactions in him.
It is clear from the weight of the evidence that the situation between mother and child is deteriorating. Mother does not recognize the child's problems or needs and the interaction between mother and child produces unacceptable, negative responses in Raymond. This situation is unlikely to improve over the foreseeable future and thus a waiver of the one year requirement is warranted and granted in this case. The Court finds that the evidence is clear and convincing that it is not in the child's best interest to allow further time for a relationship with his mother to be CT Page 3314 re-established, if indeed it even could be re-established.
ACTS OF COMMISSION OR OMISSION:
FATHER: The Court finds that the state has not proven this ground by clear and convincing evidence as to father. No evidence was presented that the child was denied any necessary guidance or control as the result of acts of commission or omission by the father. (Emphasis added). The child was never in his care or custody. Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267
(1984).
MOTHER: The court finds that the petitioner has proven by clear and convincing evidence that mother's physical abuse of the child (acts of commission) and even more importantly her failure to visit with him and take part in his therapy at the Newington Hospital, and to interact with him during the evaluation conducted by Dr. Meier, (acts of omission) have resulted in Raymond being denied the care necessary for his physical and emotional well being. Although the one year requirement is inapplicable to this ground for termination, the Court finds that these acts have been occurring for more than one year.
The negative effects upon the child resulting from mother's refusal to visit and participate in his treatment were observed by the child's therapists, Ms. Pugh and Dr. McMillon, who testified as to their observations. These acts of omission clearly had a detrimental effect upon the child and were harmful to his emotional well-being. Dr. Meier's description of the child's reaction to mother's rejection of him during the parent-child evaluation needs no elaboration.
Mothers physical and emotional abuse of this child over the years have occurred more frequently than can or should have to be tolerated. There is no reason to expect, given her lack of parenting skills, and her lack of understanding of the child's needs, that mother would treat Raymond any differently in the future than she has in the post.
This Court has found that there is no parent-child relationship between Raymond and either of his parents, and that is it not in the best interest of the child to allow additional time to see if a relationship could or would develop or be re-established. The Court additionally finds that mother is unable to deal effectively or safely with the child and his needs and therefore it would be detrimental to Raymond's best interests to permit his mother to exercise her parental rights with respect to this child.
DISPOSITION:
The Court, having found statutory grounds for terminating the parental rights of both parents, finds it clearly and convincingly proven that it is in the best interest of this child to terminate the parental rights CT Page 3315 of his father and mother. Before entering an order of termination, however, the court must consider the six factors set forth in subsection (d) of Section 17-43a of the Connecticut General Statutes.
 (1) Mother was offered numerous services, including visitation and transportation, counseling, and parent aid. Both parents were offered the opportunity to be involved with the Newington Hospital program with their son. Father was afforded the opportunity to visit with his son.
 (2) The only court order directed to the parents was to participate in a psychological evaluation and both parents complied with that order.
 (3) This child has not had any feelings or emotional ties with his father since he was at least one and one half years old. His father has had little or nothing to do with Raymond for the past five years. As of the time of the court ordered psychological evaluation, the child had no idea as to the identity of father.
 Raymond's emotional ties with mother are not positive or healthy. His feelings toward mother are those of anger, distrust. While he may have considered her as his psychological mother, he does not now look to her as the person who cares for him or meets his needs.
 The child is developing emotional ties with his foster mother, although it is not clear from the evidence whether he has bonded with her.
(4) Raymond was born on on October 13, 1983. He is seven years old.
 (5) Neither parent has made any appreciable effort to adjust his or her circumstances, conduct or conditions to make it in the best interest of the child to return him to his or her care in the foreseeable future. Mother has attended therapy but has gained little if any insight into the needs of her child or her own need to accept responsibility for him and his safety. Neither parent has utilized the opportunities afforded them to visit with the child or be involved in his therapy and treatment. Mother's feeble excuses as to why she did not use the medical taxi and bus service are unavailing.
 (6) Neither parent has been prevented from maintaining a meaningful relationship with their child by and unreasonable act of any other person. The suspension of mother's visits and telephone calls was not unreasonable under the circumstances as they were having an adverse effect upon the child.
 Neither parent's financial circumstances prevented them from seeing or interacting with their child. Mother's financial circumstances were addressed by DCYS and by the Newington Hospital when they offered to CT Page 3316 provide mother with taxi service to permit her to visit with Raymond. She refused this service because she found it inconvenient.
JUDGEMENT:
Having considered the foregoing, it is found be clear and convincing evidence to be in the best interest of Raymond W. for the parental rights of his mother and father to be terminated so that he may be raised in a safe, secure, nurturing environment, which can meet his special needs, and from which it is hoped he will eventually be placed in adoption.
It is therefore ORDERED that the parental rights of Marsha B. and Raymond W., Jr. are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child in adoption as soon as possible, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
TERENCE A. SULLIVAN, JUDGE